## P. C. COMBS V. THE STATE.

No. 7564. Decided November 7, 1923.

**1.—Murder—Evidence—Impeaching Witness—Not Original Evidence.**

The declarations of the daughter of the defendant used as a State's witness and made in the presence of the wife of the deceased and his daughters were not relevant upon any issue of the case, such declarations were purely hearsay, and when they were subsequently introduced by the wife of the deceased and his daughters they were still hearsay and were not admissible to impeach the daughter of the defendant, because they related to an immaterial matter and because she was a State's witness, nor could they be used as original evidence.

**2.—Same—Requested Charge—Impeaching Testimony.**

Having received the testimony, however, the court should as requested have limited it to impeaching purposes so that it would not be appropriated as original testimony to the injury of the defendant.

**3.—Same—Insulting Words to Female Relative—Adequate Cause.**

The insulting words relied on as adequate cause to reduce the offense to manslaughter were those addressed to the appellant at the time of the homicide, and the previous insulting remarks not having been acted on at the first meeting, although a proper subject for consideration in the general issue of adequate cause, they could not be relied upon as adequate cause as a matter of law.

**4.—Same—Uncommunicated Threats—Charge of Court.**

Assuming that it was incumbent upon the court, under the facts, to instruct the jury upon the law applicable to uncommunicated threats by the deceased, the one in the court's charge was quite sufficient. Following Lancaster v. State, 66 Texas Crim. Rep., 658.

Appeal from the District Court of Lampasas. Tried below before the Honorable M. B. Blair.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*T. S. Alexander* and *W. H. Browning* for appellant. Cited, cases in opinion.

*R. G. Storey*, Assistant Attorney General, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; punishment fixed at confinement in the penitentiary for a period of ten years.

Sometime antecedent to the homicide, the appellant resided upon the farm belonging to the deceased and upon which he also lived. Appellant had two daughters, namely: Mrs. Ruth Shirley and Fay

Crabb. Mrs. Shirley, who resided in Fort Worth, made a visit to her father, and while there, attended a gathering of young people at the home of a neighbor by the name of Jones, whose residence was about three and one-half miles distant from that at which her father resided. After the gathering, she returned to her home in company with Pascal Jones, a son of the host and hostess. They traveled alone in a buggy. The evidence is conflicting touching the hour at which the entertainment ceased. Some of the witnesses fixed the time at ten o'clock; others at about midnight.

On the morning after the entertainment, appellant's daughter Fay, who was at that time unmarried, went to the home of the deceased. While there the deceased requested her to tell her father that he wanted to see him. Responding to this request, appellant went to the deceased and a conversation took place. According to the appellant, the deceased told him in this conversation that he had something to say which might offend him, but that he (appellant) was a friend of his and that there was no use to be offended. Deceased then said: "What time did your daughter get in last night?" Appellant said: "It wasn't late." Deceased said: "Well, have you any idea what time she came in?" Appellant said: "She came in before midnight." Deceased said: "No, she didn't she did not get in until after four o'clock. Mr. Pascal Jones stayed out all night until four o'clock or after up there in the pasture with her." Appellant said that he did not believe it. Deceased said that he was a friend of the appellant and did not want to get him into trouble. He remarked that the other girls in the neighborhood were good and asked the appellant if he was going to let his daughter remain there. Appellant said that he did not believe his daughter had remained out with Jones, and the deceased said that he would not mention the matter to any one. Later, according to the appellant, deceased told him that his younger daughter was going to the bad and stated some circumstances upon which he based this opinion. Appellant said that he did not believe that his daughter had done anything subjecting her to just criticism. After these conversations, appellant remained upon the premises of the deceased for some months. They were not on unfriendly terms. Appellant was engaged by a man named Griffith to work for him, and told him that the deceased had made scandalous remarks touching Griffith's wife. Griffith talked to the deceased about the matter and it was denied by him, but said that he would see the appellant. He sent word to the appellant that the deceased wanted to see him, and the homicide took place at the meeting which followed. The deceased was plowing in his field. Appellant rode up to the fence outside of the field and called to the deceased. Appellant thus described what followed:

Deceased stopped his team, left his plow, came to the fence and said: "Good morning, Combs." Appellant said: "Good morning, Summerville." Deceased said: "Combs, I have been wanting to see you." Appellant said: "That is what I understand you have been wanting to see me." Deceased said: "What is this mess you have been telling about Mrs. Griffith to Mr. Griffith that I had said about Mrs. Griffith?" Deceased then repeated what purported to be a statement imputed to him and appeared to be getting angry. Appellant told him that he had not come for trouble. Deceased then · said: "You and Griffith don't know who in the hell you are fooling with. I have put one man under the sod and I might put another one." Appellant began moving back from the fence. Deceased had a whip in his hand and said: "You ain't told me yet what you have said. I want you to tell me what I have said about Mrs. Griffith." Appellant said: "I moved back and I told him: 'I said I could tell you' and I told him what he said. He said: 'You are a God-damned lying son-of-a-bitch' and he put his hand on the wire fence, raised his whip like that and said, 'You are a God-damned lying son-of-a-bitch.' I jerked my six-shooter and put it in his face and I said: 'Take it back,' and he dropped his hands and said: 'I will take it back.' When he said this, he said, 'I don't talk about my neighbors,' and I said, 'You don't talk about your neighbors? You don't talk about my girls all over the country?' and he said, 'Yes, I did,' and I said, 'You said she was crooked, didn't you, that her character was no account,' and he said, 'Yes, I did and I still say it.'" Deceased turned around and walked about four steps. During this time he had his shirt pushed over. Appellant was standing right against the fence, and "deceased walked about four or five steps and he throwed his hands around and when he throwed his hand around like that, I shot him, shot at him. I believed that he was going after a pistol and at that moment I shot him in my own self-defense because I believed that he was going after a pistol to shoot me, and I knew he would shoot me if he had a pistol and I believed he had one. I shot at him three times, and I don't know which of those shots hit him."

After he was shot, the deceased made a statement describing the occurrence. From the testimony of his daughter relating it, we quote: "He said Mr. Combs called him to the fence, and asked him, 'Mr. Summerville, I heard you wanted to see me about something.' and he said, 'I did,' and he said, 'What do you want to see me about,' and he said, 'I want to know what was so scandalous about Griffith's wife that was too scandalous to talk about,' and Mr. Combs said, 'That is not what I want to see you about,' and my father said, 'What is it you want to see me about?' and Combs said, 'My girl,'

and he said, 'Which one?' and Combs said, 'My girl Ruth. I understand you say she is a bad woman,' and papa said, 'I didn't say that, I said she is a crooked woman.' Combs said, 'She is not a bad woman,' and papa said, 'Combs, she is.' And my father turned around and walked off and Combs shot him."

Appellant called as a witness his daughter, Fay Crabb. She related but one fact, namely; that on one occasion, the deceased caught her by the shoulder and head and tried to kiss her, but that she struggled and released herself.

After the appellant closed his case, the State called Fay Crabb and she testified: "I did not at any time say to Mrs. Summerville and family about my sister being up nearly all night on the night of the party and being afraid to tell my father about it." After she gave this testimony, the State called Mrs. Summerville, wife of the deceased, who testified thus: "I remember the occasion when Fay came down and told us about her sister and this Jones boy laying out like they did on that night and I told Fay, asked her why she didn't go to her papa about it, and she said, 'Well, I want him to know it, but if I go and tell it, Ruth will deny it and papa will whip me to death.'"

The State also called Bessie Summerville, daughter of the deceased, and she related a conversation with Fay Crabb about the return of her sister from the singing. From her testimony we quote: "When Ruth came in Fay said that Ruth told her who had brought her home and she said not to tell her papa and Fay said that she wouldn't. Fay told me that Ruth came in and woke her up and told her that the Jones boy had brought her home and she said, 'Fay, don't tell papa, he will get mad,' and she came to our house and told us and she said that she hadn't hardly gone to sleep after that until her papa called them to get up and get breakfast."

An objection was made at the time to the inquiry by the State's counsel of the witness Fay Crabb touching her conversation with or declarations to Mrs. Summerville or Miss Bessie Summerville, concerning the return of Ruth Shirley in company with Jones. Objection was also made to the proof by Mrs. Summerville and Bessie Summerville to the effect that Fay Crabb did, upon the occasion mentioned, make the declarations imputed to her by them. After the court overruled the objections and received the testimony, appellant submitted a special charge requesting its limitation, which special charge was refused and reads thus: "Now the Court instructs you that you cannot consider this testimony for the purpose of determining when the said Mrs. Shirley arrived at her father's house on that night, nor for the purpose of affecting the character or reputation of Mrs. Shirley, nor can you consider it as affecting the guilt of

the defendant in the case, but it was admitted and can be considered by you only for the purpose of aiding you (if it does aid you) in determining the credibility of the witness, Fay Crabb.''

We fail to comprehend upon what theory the declarations of Fay Crabb, to which we have adverted, made in the presence of Mrs. Summerville and Bessie Summerville, were relevant upon any issue of the case. The State introduced Fay Crabb as her own witness. The objection should have been sustained to that part of the inquiry of Fay Crabb by the State which sought to elicit her declarations made at the Summerville home on the occasion mentioned. Such declarations would have been purely hearsay and when they were subsequently introduced through the State's witnesses, Mrs. Summerville and her daughter, they were still hearsay. They were not admissible to impeach Fay Crabb because they related to an immaterial matter, viz.; what the witness had said, and because she was a State's witness; neither were they admissible as original evidence to prove any fact. By them proof was made, not only of what Fay Crabb had said to Mrs. and Miss Summerville, but what Ruth Shirley had said to Fay Crabb. Having received the testimony, however, the court should have limited it to impeaching purposes, at least, it should have so instructed the jury that it would not be appropriated as original testimony showing that Ruth Shirley, in fact, did not return to her home on the night of the entertainment until nearly morning. Dusek v. State, 89 S. W. Rep., 272. The declarations are of such a nature that the jury would be very likely to use as proof the fact that Ruth Shirley, appellant's daughter, had remained out alone with the Jones boy for an unreasonable length of time at a very late hour of the night and that she wanted her sister Fay to suppress the fact because she was conscious of her wrong-doing and that Fay did suppress it because of fear of her father. Viewed in the light of the undisputed facts coming from both the State and the appellant that immediately before the homiicide, the deceased reiterated in the presence of the appellant, the insulting words concerning Ruth Shirley. The improper testimony and the failure to limit it cannot be regarded as harmless. It was calculated to induce the jury to discredit the appellant's theory that the insulting words used by the deceased about the daughter of the appellant produced a degree of passion which would reduce the offense to manslaughter. The insulting words relied on as adequate cause to reduce the offense to manslaughter were those addressed to the appellant at the time of the homicide. The previous insulting remarks of the deceased towards the appellant's daughter not having been acted on at the time nor at the first meeting thereafter, they could not be relied upon as adequate cause as a matter of law.

They, however, with other facts, were ·proper subject of consideration in the general issue of adequate cause. The case is not like that of Squyres v. State, 92 Texas Crim. Rep., 161, and taken as a whole, the charge on manslaughter is not subject to just criticism. Assuming that it was incumbent upon the court, under the facts, to instruct the jury upon the law applicable to uncommunicated threats by the deceased, the one in the court's charge is quite sufficient. The necessity of giving such a charge at all is by no means clear. See Lancaster v. State, 66 Texas Crim. Rep., 658.

The issue of self-defense on real and apparent danger arising from appellant's testimony was given to the jury in a charge of which there is no complaint.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*